# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **A-J MARINE, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Civil Action No. 07-1642 (RMC)** |
| | ) |
| **CORFU CONTRACTORS, INC.,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OPINION

A-J Marine, Inc. ("A-J Marine") sued Corfu Contractors, Inc. ("Corfu") and Corfu's surety The Ohio Casualty Insurance Company ("Ohio Casualty") for breach of contract and breach of payment bond, respectively.[1] Corfu filed a counterclaim against A-J Marine for breach of contract and impleaded Mr. Peter Kalos as Third Party Defendant. The parties have completed fact discovery and all have filed motions for summary judgment.

The source of the dispute is a subcontract that A-J Marine and Mr. Kalos executed, the latter purportedly on behalf of Corfu. Corfu argues, *inter alia*, that the subcontract cannot be enforced against it because Mr. Kalos had no authority to contract on its behalf. Because the legal rights of all parties are contingent upon the enforceability of the subcontract,[2] the Court will endeavor to resolve that issue first. For the reasons explained herein, the Court finds that expert

---

[1] The Court has diversity jurisdiction under 28 U.S.C. § 1332.

[2] Pursuant to the Complaint and Counterclaim, the liability of Ohio Casualty and Mr. Kalos is derivative of Corfu's liability.

testimony is needed for it to determine whether the subcontract is enforceable against Corfu. Accordingly, the Court will deny all pending motions without prejudice to refiling after the parties have completed the supplemental expert discovery contemplated by this Memorandum Opinion.

## I. FACTS

On January 10, 2006 the Washington Metropolitan Area Transit Authority ("WMATA") awarded to Corfu a contract to perform work described as "Scour Countermeasure Installation for Potomac River Memorial Bridge." The project involved the dredging and placement of stone in certain bridge piers for the Potomac River Memorial Bridge. On January 24, 2006, Ohio Casualty issued performance and payment bonds on behalf of Corfu for the project.

Prior to being awarded the WMATA contract, Corfu had subcontracted with Brickwood Contractors, Inc. ("Brickwood") to perform the work. *See* Corfu's Opp'n to Pl.'s Mot. for Partial Summ. J. ("Corfu's Opp'n") [Dkt. # 88], Ex. M (March 8, 2005 contract between Corfu and Brickwood). The subcontract provided that "[n]o assignment of this subcontract agreement is permitted without prior written permission from the Contractor." *Id.* at Art. 4.

Mr. Kalos is president of Brickwood. His wife, Veron Lee Kalos, is Brickwood's secretary and treasurer. According to Mr. Christos Kollas, Corfu's president and Rule 30(b)(6) representative,[3] Corfu's agreement with Brickwood "was that if we get the job [with WMATA] . . . he [Mr. Kalos] will perform everything on the job, paperwork, and all of the actual work on it, because he was familiar with this kind of work." Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Mem.") [Dkt. # 80], Ex. D (Dep. of Christos Kollas ("Kollas Dep.")) at 21. Mr. Kollas testified that Mr. Kalos and his wife were the only persons managing the project on behalf of Corfu:

---

[3] Fed. R. Civ. P. 30(b)(6).

> Q.   What, if any, role did Corfu — any of your — any of the individuals who participated in managing Corfu, have in the scour countermeasure project?  Did you supervise the work or keep track of it or attend meetings with WMATA or have any other role in that project —
>
> A.  No.
>
> Q.  — as a practical matter?
>
> A.  No.
>
> Q.  Okay.  You personally did not.  Your brother did not.  Your nephew did not.  Is that correct?
>
> A.  Right.  Nobody.

*Id.* at 30.[4]

On October 16, 2006, Mr. Kollas executed a document on behalf of Corfu, apparently requested by WMATA, entitled "power of execution."  *See id.*, Ex. E.  Pursuant to the power of execution, Corfu:

> nominates, constitutes, and appoints Peter Kalos, Project Supervisor with full power to act alone on behalf of Corfu Contractors, Inc. to make, execute, seal and deliver on its behalf as contractor and as its act and deed, any and all contracts, change orders, monthly and final payment certificates and other like instruments.

*Id.*  The power of execution was delivered to WMATA by cover letter dated July 24, 2007.  *Id.*  The July 24, 2007 cover letter appears to be from Mr. Kollas.[5]  Corfu also submitted to WMATA a list

---

[4] One of the reasons that Mr. Kollas played no role in the project was that he was physically absent for much of the relevant time.  He testified that he travels to Corfu, Greece for a few months each winter and summer.  *See* Kollas Dep. at 28, 35.

[5] Mr. Kollas testified that he did not sign the July 24, 2007 letter.  *See* Corfu's Opp'n at 5.  That would make sense given his summer trips to Greece.  The record is inconclusive as to who signed Mr. Kollas's name on the letter.

of its personnel, on which  Mrs. Kalos was listed as "project manager" who can be contacted at "CorfuContractors@aol.com" and Mr. Kalos was listed as "superintendent."  *Id.*, Ex. F

      Mrs. Kalos testified on behalf of Brickwood that she maintained a supply of Corfu letterhead at her office.  *Id.*, Ex. G (Dep. of Veron Lee Kalos ("L. Kalos Dep.")) at 30.  She testified that she sent letters to third parties on Corfu letterhead because "Corfu and Brickwood were working together, and we were working under Corfu's name."  *Id.* at 29.  She also testified that she issued checks on behalf of Corfu to pay Corfu's vendors:

> A.   Somebody would give me a signed check.   I didn't take it somewhere to get it signed.  I was given a signed check.
>
> Q.  Before it was filled out?
>
> A.  Yes.
>
> Q.  And then you would fill it out?
>
> A.  Yes.
>
> Q.  When Mr. Kollas left for Greece, did he leave you with a stack of signed checks for you to fill out?
>
> A.  Yes.  I always had a check.
>
> Q.  So the signatures preceded the information about payee?
>
> A.  Right.

      On October 24, 2006, Mr. Kalos, purportedly acting on behalf of Corfu, subcontracted with Mr. James D. Nicholas, president of A-J Marine, in apparent disregard of Brickwood's contract with Corfu that disallowed subcontracts without Corfu's prior consent.[6]  The subcontract was for A-J

---

[6]  While Mr. Kalos was qualified to perform the work himself, he contracted with A-J Marine because he anticipated that WMATA would issue a change order enlarging the scope of the project from four piers to seven, which was too much for Mr. Kalos to do alone given his other projects.

Marine to perform mechanical dredging and stone placement for $85,371 per month, plus a mobilization fee of $5,000 and a demobilization fee of $5,000. *See id.*, Ex. B. Thereafter, A-J Marine immediately mobilized its crew and equipment, as the subcontract required it to do. However, Corfu did not deliver the dredge material barges and stone material barges loaded with stone, as it had promised.

On December 8, 2006, Mr. Kalos sent Mr. Nicholas a letter on Corfu letterhead stating:

> We do not accept your equipment until we receive confirmation your equipment is without defects and your vessels are seaworthy. In addition, A-J Marine, Inc. and your employees are not allowed on-site until you have all required insurance coverage, and an acceptable insurance certificate is required.
>
> Your request for payment for mobilization and rental is disapproved. Corfu does not accept mobilization by A-J Marine, Inc., until the above deficiencies are fully and completely cured.

Corfu's Mem. in Supp. of Mot. for Summ. J. ("Corfu's Mem.") [Dkt. # 81], Ex. E.[7]

On December 22, 2006, A-J Marine obtained a quote from its insurance agent for the additional coverage that Corfu had requested. By letter dated January 10, 2007, A-J Marine demanded that Corfu pay the cost of the additional insurance, having been advised by its attorney that the subcontract requires Corfu to pay for such additional insurance. *See id.*, Ex. G. Corfu

---

*See* Pl.'s Mem, Ex. C (Dep. of Peter Kalos) at 32-33. This larger volume of work never materialized.

[7] With respect to insurance, the subcontract provides that "[t]he Subcontractor agrees to obtain and pay for the following insurance coverages: Workmen's Compensation, Public Liability, Property Damage, and any other insurance coverage which may be necessary as required by the Owner, Contractor, or State Law, Per Contract Specifications and County Requirements." Pl.'s Mem., Ex. B. An addendum to the subcontract provides that "[a]ny additional insurance requirements above what is in place will be passed thru to the general contractor." *Id.*

refused.  By letter dated February 6, 2007, Corfu advised A-J Marine that "your failure upon receipt of a cure notice is a substantial and material breach of your contract.  We have made arrangements to complete your work with other companies." Pl.'s Mem., Ex. Q.  A-J Marine did no work on the project.  This lawsuit ensued.

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. ANALYSIS

A-J Marine argues that Corfu wrongfully abandoned the subcontract.  Corfu argues that the subcontract is not enforceable against it because Mr. Kalos had no authority to contract on its behalf, and to the extent that the Court finds otherwise, A-J Marine's failure to obtain additional insurance coverage was a material breach that excused Corfu from performance.  Corfu also argues that even if it breached the subcontract, A-J Marine is not entitled to its claimed expectation damages.

First things first.  A-J Marine does not dispute, and therefore concedes, Corfu's contention that Mr. Kalos lacked actual authority to bind Corfu to the subcontract with A-J Marine. Instead, A-J Marine argues only that Mr. Kalos had apparent authority to contract for Corfu.  *See* Pl.'s Mem. at 5-6 ("Corfu has raised an issue of agency. . . .  Whatever may have been the private understanding between Mr. Kalos and Corfu of Mr. Kalos's authority to act as Corfu's agent, Mr. Kalos had apparent authority to do so, and his apparent authority was unmistakable.").

District of Columbia courts apply the Restatement of Agency in resolving issues of apparent authority.  *See Makins v. District of Columbia*, 861 A.2d 590, 593 (D.C. 2004) (en banc).[8] Apparent authority "is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation."  Restatement (Third) of Agency § 3.03.  "A person manifests assent or intention through written or spoken words or other

---

[8]  All parties agree that District of Columbia law applies to this dispute.  In *Makins*, the District of Columbia Court of Appeals applied the Restatement (Second) of Agency.  *See Makins*, 861 A.2d at 593-94.  After that decision issued in 2004, the American Law Institute adopted and promulgated the Restatement (Third) of Agency in 2005.  Therefore, the Court will apply the Restatement (Third) of Agency to this case.

conduct." *Id.* § 1.03. "The relevant state of mind is that of the person who observes or otherwise learns of the manifestation." *Id.*, comment b. "Apparent authority is present only when a third party's belief is traceable to manifestations of the principal." *Id.* § 3.03, comment b; *see Makins*, 861 A.2d at 594 ("apparent authority depends upon the principal's manifestations to the third party"). "Whether an agent had apparent authority is a question of fact and the party asserting the existence of apparent authority must prove it." *Makins*, 861 A.2d at 594.

A-J Marine argues that "Corfu allowed Mr. Kalos to operate the jobsite and all aspects of the 'scour countermeasure' project, including all dealings with WMATA and subcontractors, in a manner that caused all to believe that [Mr.] Kalos and Corfu were one and the same." Pl.'s Reply [Dkt. # 91] at 6. That may be true with respect to WMATA and to subcontractors who had knowledge of the power of execution in which Corfu authorized Mr. Kalos to act on its behalf. There is no evidence in the record that A-J Marine was aware of the power of execution when it signed the subcontract on October 24, 2006.[9] Nor has A-J Marine pointed to any other manifestation *by Corfu* that caused A-J Marine to believe that Mr. Kalos was an agent of Corfu at the time it signed the subcontract.

To the contrary, the evidence A-J Marine marshaled in discovery shows that A-J Marine relied on nothing more than Mr. Kalos's own representations that he was acting on behalf of Corfu. Mr. Nicholas testified on behalf of A-J Marine that "[a]s far as I knew, [Mr. Kalos] was acting as Corfu. I don't know in what capacity. That's how he identified himself, as just Corfu Contractors." Corfu's Opp'n, Ex. 5 (Dep. of James D. Nicholas ("Nicholas Dep.")) at 43. When

---

[9]   Indeed, had A-J Marine been aware of the power of execution on October 24, 2006, there would have been no reason for A-J Marine to request proof of Mr. Kalos's authority by letter dated November 15, 2006, discussed below.

asked if Mr. Kalos had "any business cards or emblems or anything that would tell someone what

company he was working for," Mr. Nicholas responded only that "[h]e produced letterhead with

'Contract' on it."[10] *Id.*  Mr. Nicholas testified that he never met or spoke with Mr. Kollas.  *Id.* at 74.

While A-J Marine uncovered in discovery evidence that, had it been known to it earlier, could have

formed the basis for a belief that Corfu had authorized Mr. Kalos to act as Corfu's agent, none of it

was known to A-J Marine at the time it contracted with Mr. Kalos.

> Most injurious to A-J Marine's case is that Mr. Nicholas expressed his own doubts

about Mr. Kalos's authority to contract for Corfu in a letter to Mr. Kalos dated November 15, 2006:

> You stated to me that you were not the owner of Corfu Contractors,
> Inc. and promised me a statement of authority/affidavit (notarized) of
> your authority to execute contractual agreements on behalf of Corfu
> Contractors, Inc.  You have neglected to provide proof of this after
> repeated requests which without the contractual agreement is
> considered to be in the least misrepresented.  You said you were a
> man of your word so please provide this ASAP.

*Id.*, Ex. L.  As Mrs. Kalos testified on behalf of Brickwood, Mr. Nicholas "wanted Christos Kollas

[Corfu's owner and president] to notarize a letter confirming that Peter Kalos had the authority to

execute a contract with A-J Marine" on behalf of Corfu.  L. Kalos Dep. at 62.  Mr. Nicholas's

sentiments expressed in his letter to Mr. Kalos show not only that his belief in Mr. Kalos's authority

was based on nothing more than Mr. Kalos's own representations; *i.e.* Mr. Kalos's "word," but also

that he had doubts about Mr. Kalos's authority.  "Apparent authority depends upon 'the third-party's

---

[10]  Mr. Nicholas's deposition testimony does not make clear whether the letterhead was that
of Corfu's or Mr. Kalos's own company, Brickwood.  Nor does his deposition testimony elaborate
as to the nature of the contract that Mr. Kalos showed him.  But even assuming the document was
on Corfu's letterhead and was a contract with Brickwood to act on its behalf, Mr. Nicholas's
subsequent letter establishes that he did not perceive Mr. Kalos to have had authority to contract on
Corfu's behalf.  Because A-J Marine bears the burden of proving the existence of apparent authority,
the Court will construe any ambiguities against it.

perception of the agent's authority.'" *Makins*, 861 A.2d at 594 (quoting *Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204, 1219 (D.C. 1991)). His letter to Mr. Kalos clearly indicated that Mr. Nicholas did not perceive Mr. Kalos to have the authority to contract for Corfu. Mr. Nicholas's doubts about Mr. Kalos's contracting authority were only reinforced by the undisputed fact that Mr. Nicholas never received a statement of authority or notarized affidavit from Mr. Kalos, as he had requested in his November 15, 2006 letter. *See* L. Kalos Dep. at 62, 133.

A-J Marine relies on cases in which the principal placed the actor in a position that led a third party to believe that the actor was the principal's agent. Those cases are distinguishable because none involved a third party who had no knowledge of the principal's manifestation. In other words, each involved something more than the agent's own representation of authority to contract for the principal. *See*, *e.g.*, *Livingston v. Fuhrman*, 37 A.2d 747, 748 (D.C. 1944) (third party contacted agent at principal's phone number and bought from agent at principal's store); *Jack Pry, Inc. v. Drazin*, 173 A.2d 222, 222 (D.C. 1961) (third party had negotiations with both principal and agent); *Feltman v. Sarbov*, 366 A.2d 137, 137, 140 (D.C. 1976) (third party negotiated with agent specifically retained by principal for purposes of consummating the transaction); *Tel-Ads, Inc. v. Trans-Lux Playhouse, Inc.*, 232 F. Supp. 198, 199 (D.D.C. 1964) (third party entered into contract with principal's district manager).[11] By contrast, other than the representations made by Mr. Kalos,

---

[11] To the extent that any one of these cases is not factually distinguishable, it has been implicitly overruled by the subsequent en banc decision of the D.C. Court of Appeals in *Makins*, which clarified that "apparent authority depends upon the principal's manifestations to the third party." *Makins*, 861 A.2d at 594. The question in that case was "[u]nder District of Columbia law, is a client bound by a settlement agreement negotiated by her attorney when the client has not given the attorney actual authority to settle the case on those terms but has authorized the attorney to attend a settlement conference before a magistrate judge and to negotiate on her behalf and when the attorney leads the opposing party to believe that the client has agreed to those terms." *Id.* at 592. In answering the question in the negative, the court explained:

A-J Marine had no reason to believe that Mr. Kalos was acting on behalf of Corfu.  Mr. Nicholas's November 15, 2006 letter confirms that he was unaware of any manifestation by Corfu that could have led him to believe that Corfu had authorized Mr. Kalos to represent it.  Therefore, because Mr. Kalos's own representations were the sole basis for A-J Marine's belief that Mr. Kalos was an agent of Corfu, A-J Marine cannot trace its belief to any manifestation by Corfu.

The analysis does not end there, however, for the Restatement provides that "[a] principal may also create apparent authority by actually or apparently authorizing an agent to make representations to third parties concerning the agent's own authority or position, even though the agent's representations by themselves would be insufficient." Restatement (Third) of Agency § 3.03, comment b.  "The determinative question is whether a third party can establish a linkage between statements of authority by the agent and a manifestation of assent by the principal to the making of such statements." *Id.*  "If no such linkage can be established, the third party may be able nonetheless to estop the principal from denying the agent's authority under the doctrine stated in § 2.05 if the principal is responsible for the agent's representation, typically because the principal did not exercise reasonable care to prevent the agent from making the representation or to inform the third party of

---

We take as a given that a third party in the shoes of the District of Columbia would reasonably assume that Makins [the client] had authorized attorney Harrison (1) to attend the settlement conference, and (2) to negotiate on her behalf . . . .  We hold, however, that absent further manifestations by Makins — not Harrison — . . . there was insufficient conduct by the client to support a reasonable belief by the District that Harrison had full and final authority to the settlement terms.

*Id.* at 594.  "Harrison's conduct and representations about his own authority, in short, are not dispositive to whether Makins herself furnished the basis for a reasonable belief that he was authorized to conclude the settlement."  *Id.* at 596.

its falsity." *Id.*

While the power of execution apparently, if not actually, authorized Mr. Kalos to make representations to A-J Marine concerning his authority to enter into contracts on behalf of Corfu,[12] there is no evidence in the record linking the two.  In other words, there is no evidence that Mr. Kalos made his statements of authority to A-J Marine based on his belief that, because of the power of execution or some other manifestation of assent, Corfu had given him the authority to make such statements.  Because the Court has not been made privy to the entirety of Mr. Kalos's deposition, it cannot say for sure why Mr. Kalos thought he could represent to A-J Marine that he had authority to contract on behalf of Corfu.  But the portion of his deposition testimony that the parties have provided with their briefs does not suggest that Mr. Kalos made the representations because of a manifestation of assent to do so by Corfu.  Indeed, it is doubtful that Mr. Kalos thought Corfu had given him authority to make the representations he made to A-J Marine.  Mr. Kollas, Corfu's owner and president, testified that he had not heard of A-J Marine until it sued Corfu and that "I would not have allowed for [Mr. Kalos] to have a subcontractor; because the agreement me and him, he had — we had, it was for him to do the work."  Kollas Dep. at 50, 51-52.

Still remaining is whether Corfu should be estopped from denying Mr. Kalos's apparent authority because it failed to exercise reasonable care to prevent Mr. Kalos from making the representations or to inform A-J Marine of their falsity.  *See DBI Architects, P.C. v. Am. Express*

---

[12]   Corfu argues that the power of execution "deals with Mr. Kalos' ability to deal with the WMATA, and grants no authority to Peter Kalos to enter into subcontracts with vendors or subcontractors on the project."  Corfu's Opp'n at 5.  A-J Marine counters that "[s]ince the prime contract between WMATA and Corfu had already been signed, to what contracts could this 'Power of Execution' have been intended to infer?  The answer is: subcontracts."  Pl.'s Reply at 6.  The Court need not resolve the issue because the Court finds that even if the power of execution did not actually authorize Mr. Kalos to enter into subcontracts with vendors, it apparently did so.

*Travel-Related Servs. Co.*, 388 F.3d 886, 890 (D.C. Cir. 2004) ("a principal may be estopped from denying apparent authority if the principal intentionally or negligently created an appearance of authority in the agent, on which a third party relied in changing its position").  Section 2.05 of the Restatement provides:

> A person who has not made a manifestation that an actor has authority as an agent and who is not otherwise liable as a party to a transaction purportedly done by the actor on that person's account is subject to liability to a third party who justifiably is induced to make a detrimental change in position because the transaction is believed to be on the person's account, if (1) the person intentionally or carelessly caused such belief, or (2) having notice of such belief and that it might induce others to change their positions, the person did not take reasonable steps to notify them of the facts.

Restatement (Third) of Agency § 2.05.  "The doctrine is applicable when the person against whom estoppel is asserted has made no manifestation that an actor has authority as an agent but is responsible for the third party's belief that an actor is an agent and the third party has justifiably been induced by that belief to undergo a detrimental change in position."  *Id.*, comment c.  "Most often the person estopped will be responsible for the third party's erroneous belief as the consequence of a failure to use reasonable care, either to prevent circumstances that foreseeably led to the belief, or to correct the belief once on notice of it."  *Id.*  Unlike apparent authority which "is not present unless the third party's belief is traceable to the principal's own manifestations, . . . [e]stoppel does not require as close a fit between affirmative acts of the principal and the third party's belief."  *Id.*, comment d.  "Instead, it protects third parties who reasonably believe an actor to be authorized as an agent when the belief cannot be shown to follow directly or indirectly from the principal's own manifestations."  *Id.*

Illustration 2 of § 2.05 comes nearest to the facts here:

> P owns a large retail furniture store, known as "P's Furniture
> Emporium." P, who is often absent from the premises, does not
> otherwise maintain surveillance over the store's sales force. T, a
> prospective customer, enters the store and is approached by A, whose
> demeanor and attire lend A the appearance of a salesperson. After
> examining floor samples, T purchases several items of furniture for
> cash, giving the cash to A. A gives T a receipt written on a standard-
> looking form, with "P's Furniture Emporium" printed at the top. A
> explains to T that the items purchased are not presently in inventory
> but will be delivered to T's home within two weeks. A is an imposter
> who is not an employee or other agent of P. A does not remit any of
> the cash paid by T to P. No furniture is delivered to T. T's change of
> position is justified by T's belief that A is what A purports to be, a
> salesperson with authority to sell from P's inventory. Whether P may
> deny A's authority is a question for the trier of fact.

*Id.*, Illustration 2.

Like the principal in the illustration, there is a question whether Corfu failed to use

reasonable care to prevent the circumstances that caused A-J Marine to believe that Mr. Kalos was

an agent of Corfu. The Court notes that Mr. Kollas effectively entrusted Mr. and Mrs. Kalos to act

in Corfu's stead with respect to the WMATA project while he traveled to Greece, and it does not

appear that he or any other employee of Corfu supervised their activities. While the Court is aware

that it, and not a jury, is the trier of fact in this case,[13] this question cannot be answered on this

record. Before the Court can determine whether Corfu failed to use reasonable care, it must first

receive evidence in the form of expert testimony about what the relevant standard of care is in the

construction industry. *See St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 627 F.

Supp. 2d 1, 7 (D.D.C. 2009) ("It is well established in the District of Columbia that 'a plaintiff must

put on expert testimony to establish what the standard of care is if the subject in question is so

distinctly related to some science, profession or occupation as to be beyond the ken of the average

---

[13] Neither the Complaint nor the Counterclaim demand a jury trial.

layperson.'") (quoting *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000));

*see also id.* ("As the United States Court of Appeals for the District of Columbia Circuit has

observed, 'the D.C. Court of Appeals has required expert testimony in a number of cases that, on

first blush, appear to be within the realm of common knowledge,' such as the maintenance of leaning

trees, application of hair relaxer, or the tightness of handcuffs.") (quoting *Briggs v. Wash. Metro.*

*Area Trans. Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007)).

There also is a question whether A-J Marine was justified in believing that Mr. Kalos

was an agent of Corfu.  "If the third party is unreasonable in believing that an agency relationship

exists and that the actor has authority, the third party should not recover, just as a plaintiff's

contributory negligence in relying on a negligent misrepresentation bars recovery or reduces it under

a rule of comparative negligence."  Restatement (Third) of Agency § 2.05, comment d.  The Court

notes that in forming his belief, Mr. Nicholas relied on nothing more than Mr. Kalos's own

representations.  Before the Court can determine whether A-J Marine's belief was justified, it must

first receive evidence in the form of expert testimony about what the relevant standard of care is in

the construction industry. *See St. Paul Mercury Ins. Co.*, 627 F. Supp. 2d at 7.  Accordingly, the

Court will order the parties to complete supplemental expert discovery limited to the relevant

standards of care in the construction industry.[14]

One final point needs to be addressed.  A-J Marine seeks $624,158 in damages.  It

contends that that is the amount of the loss of the benefit of its bargain with Corfu.  Corfu argues that

even if it is in breach of the subcontract, A-J Marine cannot recover that amount as a matter of law

---

[14]   The Court will decide whether the subcontract is enforceable against Corfu before
deciding whether it was A-J Marine or Corfu who breached the subcontract.

because "Mr. Nicholas was totally unprepared to testify at the deposition [as to the calculation of damages] and had none of the supporting documents or information to support A-J Marine's claims[,]" Corfu's Mem. at 10, and in any event "the maximum amount of time for which it could recover is . . . a period of four and a half months." *Id.* at 15. A-J Marine responds that "Corfu's motion ignores the documentation pertaining to A-J Marine's damages that A-J Marine had produced in discovery long prior to June 4, 2009, and which had been the subject of examination during A-J Marine's prior deposition." Pl.'s Opp'n to Corfu's Mot. for Summ. J. [Dkt. # 85] at 5. A-J Marine insists that "[t]he amount of damages which A-J Marine is entitled to recover requires the Court to resolve issues of fact, among others, as to the period of time for which A-J Marine is entitled to compensation and the amount due for each period." *Id.* at 7. The Court will abstain from ruling on damages until liability is determined.[15]

## IV. CONCLUSION

For the foregoing reasons, the Court will deny all pending motions without prejudice to refiling after the parties have completed the supplemental expert discovery contemplated by this Memorandum Opinion. The Court will order the parties to file a joint proposed expert discovery schedule no later than October 23, 2009. A memorializing Order accompanies this Memorandum Opinion.

Date: October 9, 2009                              _____/s/_____

                                                   ROSEMARY M. COLLYER
                                                   United States District Judge

---

[15]   While the Court does not now rule on damages, the parties should be aware that the damages available under an estoppel theory of liability may be more limited than the damages available in an ordinary breach of contract case. *See* Restatement (Third) of Agency § 2.05, comment d; Restatement (Second) of Torts § 552B.

-16-