# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **A-J MARINE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-1642 (RMC)** |
| | ) | |
| **CORFU CONTRACTORS, INC.,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

A-J Marine, Inc., sued Corfu Contractors, Inc., and Corfu's surety, The Ohio Casualty Insurance Company, for breach of a construction contract and a payment bond, respectively. Corfu responded with a counterclaim against A-J Marine for breach of contract and impleaded Peter Kalos, owner of Brickwood Contractors, Inc., as third party defendant. All defendants have been trying to get out of this lawsuit since its early days and now refile their motions for summary judgment.

The source of dispute is a subcontract executed by A-J Marine and Mr. Kalos, the latter in Corfu's name. Corfu argues that Mr. Kalos had no authority to sign a subcontract on its behalf, that A-J Marine itself doubted Mr. Kalos's authority, and that it cannot be liable to A-J Marine for lost profits in any event. Because the legal rights of the parties depend upon the subcontract, the Court addressed that issue first, most recently by directing the parties to supplement their discovery with expert testimony on the applicable standard of care under which A-J Marine could have legitimately believed that Mr. Kalos had apparent authority to contract in Corfu's name and whether Corfu so positioned Mr. Kalos that, despite his lack of authority, Corfu should be

estopped from denying the subcontract.

We are now at round two of summary judgment motions.  The Court reiterates its prior finding that Mr. Kalos lacked actual authority to subcontract Brickwood work as a Corfu agent. Although discussed below, the Court avoids a decision on whether Mr. Kalos had apparent authority to contract in Corfu's name and whether Corfu should be estopped from denying liability under the subcontract.  The parties' factual presentations and briefs are just too muddled for decision. Moreover, the question of whether Corfu ratified the subcontract cannot be decided without presentation to a factfinder as there are material contested facts concerning the role (and presence) of Christos Kollas of Corfu in the fall of 2006 and the summer/early fall of 2007.  Happily, the Court need not resolve these questions to enter summary judgment for Corfu because the Court finds that A-J Marine breached the subcontract by not obtaining required insurance.  Partial summary judgment must be entered for Ohio Casualty on the scope of its potential liability.  Inasmuch as Corfu's potential liability rests, if it exists at all, on Mr. Kollas's own actions or inactions, the Court will also dismiss the counterclaims against Peter Kalos.

## I.  FACTS

The Court repeats the summary of the facts from its 2009 Opinion in *A-J Marine, Inc. v. Corfu Contrs., Inc.,* 660 F. Supp. 2d 84 (D.D.C. 2009):

- - - - -

On January 10, 2006 the Washington Metropolitan Area Transit Authority ("WMATA") awarded to Corfu a contract to perform work described as "Scour Countermeasure Installation for Potomac River Memorial Bridge." The project involved the dredging and placement of stone in certain bridge

piers for the Potomac River Memorial Bridge.  On January 24, 2006, Ohio Casualty issued performance and payment bonds on behalf of Corfu for the project.

Prior to being awarded the WMATA contract, Corfu had subcontracted with Brickwood Contractors, Inc. ("Brickwood") to perform the work.  *See* [Dkt. # 88], Ex. M (March 8, 2005 subcontract between Corfu and Brickwood).  The subcontract provided that "[n]o assignment of this subcontract agreement is permitted without prior written permission from the Contractor."  *Id.* at Art. 4.

Mr. Kalos is president of Brickwood.  His wife, Veron Lee Kalos, is Brickwood's secretary and treasurer.  According to Mr. Christos Kollas, Corfu's president and Rule 30(b)(6) representative,[1] Corfu's agreement with Brickwood "was that if we get the job [with WMATA] . . . he [Mr. Kalos] will perform everything on the job, paperwork, and all of the actual work on it, because he was familiar with this kind of work."  [Dkt. # 80], Ex. D (Dep. of Christos Kollas ("Kollas Dep.")) at 21.  Mr. Kollas testified that Mr. Kalos and his wife were the only persons managing the project on behalf of Corfu:

> Q.  What, if any, role did Corfu — any of your — any of the individuals who participated in managing Corfu, have in the scour countermeasure project?  Did you supervise the work or keep track of it or attend meetings with WMATA or have any other role in that project —

---

[1] FED. R. CIV. P. 30(b)(6).

A. No.

Q. — as a practical matter?

A. No.

Q. Okay. You personally did not. Your brother did not. Your nephew did not. Is that correct?

A. Right. Nobody.

*Id.* at 30.

On October 16, 2006, Mr. Kollas executed a document on behalf of Corfu, apparently requested by WMATA, entitled "power of execution." *See id.*, Ex. E. Pursuant to the power of execution, Corfu:

> nominates, constitutes, and appoints Peter Kalos, Project Supervisor with full power to act alone on behalf of Corfu Contractors, Inc. to make, execute, seal and deliver on its behalf as contractor and as its act and deed, any and all contracts, change orders, monthly and final payment certificates and other like instruments.

*Id.* The power of execution was delivered to WMATA by cover letter dated July 24, 2007. *Id.* The July 24, 2007 cover letter appears to be from Mr. Kollas.[2] Corfu also submitted to WMATA a list of its personnel, on which Mrs. Kalos was listed as "project manager" who [could] be contacted at "CorfuContractors@aol.com" and Mr. Kalos was listed as "superintendent." *Id.*, Ex. F

---

[2] Mr. Kollas testified that he did not sign the July 24, 2007 letter. *See* [Dkt. # 88] at 5. The record is not clear as to who signed his name.

Mrs. Kalos testified on behalf of Brickwood that she maintained a supply of Corfu letterhead at her office. *Id.*, Ex. G (Dep. of Veron Lee Kalos ("L. Kalos Dep.")) at 30.  She testified that she sent letters to third parties on Corfu letterhead because "Corfu and Brickwood were working together, and we were working under Corfu's name." *Id.* at 29.  She also testified that she issued checks on behalf of Corfu to pay Corfu's vendors:

> A.  Somebody would give me a signed check.  I didn't take it somewhere to get it signed.  I was given a signed check.
>
> Q.  Before it was filled out?
>
> A.  Yes.
>
> Q.  And then you would fill it out?
>
> A.  Yes.
>
> Q.  When Mr. Kollas left for Greece, did he leave you with a stack of signed checks for you to fill out?
>
> A.  Yes.  I always had a check.
>
> Q.  So the signatures preceded the information about payee?
>
> A.  Right.

On October 24, 2006, Mr. Kalos, purportedly acting on behalf of Corfu, subcontracted with Mr. James D. Nicholas, president of A-J Marine, in apparent disregard of Brickwood's contract with Corfu that disallowed

subcontracts without Corfu's prior consent.[3]   The subcontract was for A-J Marine to perform mechanical dredging and stone placement for $85,371 per month, plus a mobilization fee of $5,000 and a demobilization fee of $5,000. *See id.*, Ex. B.   Thereafter, A-J Marine immediately mobilized its crew and equipment, as the subcontract required it to do.   However, Corfu did not deliver the dredge material barges and stone material barges loaded with stone, as it had promised.

On December 8, 2006, Mr. Kalos sent Mr. Nicholas a letter on Corfu letterhead stating:

> We do not accept your equipment until we receive confirmation your equipment is without defects and your vessels are seaworthy.   In addition, A-J Marine, Inc. and your employees are not allowed on-site until you have all required insurance coverage, and an acceptable insurance certificate is required.
>
> Your request for payment for mobilization and rental is disapproved.   Corfu does not accept mobilization by A-J Marine, Inc., until the above deficiencies are fully and completely cured.

[Dkt. # 81], Ex. E.[4]

---

[3]   While Mr. Kalos was qualified to perform the work himself, he contracted with A-J Marine because he anticipated that WMATA would issue a change order enlarging the scope of the project from four piers to seven, which was too much for [Brickwood] to do alone given [its] other projects.

[4]   With respect to insurance, the subcontract provide[d] that "[t]he Subcontractor agrees to obtain and pay for the following insurance coverages: Workmen's Compensation, Public Liability, Property Damage, and any other insurance coverage which may be necessary as required by the Owner, Contractor, or State Law, Per Contract Specifications and County Requirements." [Dkt. # 80], Ex. B.   An addendum to the subcontract provides that "[a]ny additional insurance

On December 22, 2006, A-J Marine obtained a quote from its insurance agent for the additional coverage that Corfu had requested.  By letter dated January 10, 2007, A-J Marine demanded that Corfu pay the cost of the additional insurance, having been advised by its attorney that the subcontract require[d] Corfu to pay for such additional insurance.  *See id.*, Ex. G.  Corfu refused.  By letter dated February 6, 2007, Corfu advised A-J Marine that "your failure upon receipt of a cure notice is a substantial and material breach of your contract.  We have made arrangements to complete your work with other companies." [Dkt. # 80], Ex. Q.  A-J Marine did no work on the project.  This lawsuit ensued.

- - - - -

*A-J Marine*, 660 F. Supp. 2d at 86–88 (internal citations altered).

Following fact discovery, the Court denied the first round of motions for summary judgment without prejudice and ordered expert discovery on industry standards on agency.  *See id*. at 93.  Expert discovery is now complete and the parties' renewed motions for summary judgment are now ripe.

## II.  LEGAL STANDARD

A court's subject-matter jurisdiction is determined based on the facts as they existed at the time the case was filed.  *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 570–71 (2004); *see also St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 291–92 (1938) (noting that in a removal case, subject-matter jurisdiction is determined as of the time the petition for

_____

requirements above what is in place will be passed thru to the general contractor."  *Id.*

removal was filed).   A court has diversity jurisdiction if there is complete diversity among the parties; *i.e.*, there are no litigants from the same state on the same side of the controversy, and the amount in dispute is more than $75,000.  28 U.S.C. § 1332(a)(1); *see also Prakash v. Am. Univ.*, 727 F.2d 1174, 1178 n.25 (D.C. Cir. 1984).   The parties do not dispute that A-J Marine is a Maryland corporation, Ohio Casualty is an Ohio corporation, and Corfu is a Virginia corporation.   Per the complaint, A-J Marine seeks judgment well over $75,000.   Although Mr. Kalos, a resident of Virginia, was added at a later stage in the litigation by Corfu's Third Party Complaint, the Court maintains diversity jurisdiction under 28 U.S.C. § 1332.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.   A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.   In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).   Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675.   If the evidence "is merely colorable, or is not

significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

### III.  ANALYSIS

#### A.  Did Mr. Kalos Have Actual Authority to Contract As Corfu?

A-J Marine strongly argues that Mr. Kalos had actual authority, not just apparent authority, to act for Corfu.  In its 2009 Opinion, the Court noted that "A-J Marine does not dispute, and therefore concedes, Corfu's contention that Mr. Kalos lacked actual authority to bind Corfu to the subcontract with A-J Marine."  *A-J Marine*, 660 F. Supp. 2d at 88.  However, in the current briefing on summary judgment, A-J Marine contends that it "has from the outset of this proceeding expressly stated that it is obvious that Mr. Kalos had actual authority. . . .  By referring throughout its motions and responses to 'apparent authority,' A-J Marine did not suggest that Mr. Kalos lacked actual authority."  Pl.'s Opp'n to Corfu's Mot. for Summ. J. [Dkt. # 141] ("Pl.'s Opp'n") at 18.  A-J Marine asks the Court to reconsider its prior determination on actual authority, *id.*, which the Court undertakes now as the 2009 Opinion was not a final disposition of this case.  *See* Fed. R. Civ. P. 54(b).

Principles of agency are employed to determine whether an actor has actual or apparent authority to bind a principal to a contract.  *Makins v. Dist. of Columbia*, 861 A.2d 590, 593 (D.C. 2004) (en banc).  "Whether an agency relationship exists in a given situation depends on the particular facts of each case."  *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000).  "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, *in accordance with the principal's manifestations to the agent*, that the principal wishes the agent so to act."  Restatement (Third) of Agency: Actual Authority

§ 2.01 (2006) (emphasis added).  Actual authority can be created expressly or by implication through "written or spoken words or other conduct of the principal, which reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Evans v. Skinner*, 742 F. Supp. 30, 32 (D.D.C. 1990) (quoting RESTATEMENT (SECOND) OF AGENCY § 26 (1958)); *see also Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204, 1217–18 (D.C. 1991) ("Implied authority is actual authority inferred from the circumstances, such as the relationship between the parties and conduct of the principal toward the agent manifesting the principal's consent to have the agent act for him.") (quoting *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 669 (D.C. 1983)).

A-J Marine cites a litany of evidence for the proposition that Mr. Kalos had actual authority to bind Corfu.  A-J Marine mentions, inter alia, the agreement between Mr. Kollas of Corfu and Mr. Kalos of Brickwood that Brickwood would perform all the work on the WMATA project, memorialized in a subcontract; Mr. Kollas's physical absence between Christmas 2006 and March 2007 as well as from July to September 2007 during the working phase of the project, leaving Mr. Kalos in charge; Corfu's October 16, 2006 power of execution mailed to WMATA on July 24, 2007, authorizing Mr. Kalos to act for Corfu as Project Supervisor "with full power to act alone on behalf of Corfu . . . to make, execute, seal and deliver on its behalf as contractor and as its act and deed, any and all contracts, change orders, monthly and final payment certificates and other like instruments" in his dealings with WMATA, *see* [Dkt. # 80], Ex. E (Power of Execution); Mr. Kalos's actions of signing subcontracts for the project and attending periodic progress meetings with WMATA as "Corfu;" the listing of both Mr. and Mrs. Kalos on Corfu payrolls; and the facts that Mrs. Kalos maintained Corfu stationary, issued pre-signed Corfu checks to pay Corfu vendors, and handled legal questions, at least in their initial stages, on Corfu's behalf.  *See* Pl.'s Opp'n at 7–17.

-10-

To be sure, the record reveals that Corfu relinquished a great deal of authority to Mr. Kalos in its dealings with WMATA during Mr. Kollas's absence. Critically, however, the March 8, 2005 subcontract between Brickwood and Corfu expressly provided that "[n]o assignment of this subcontract agreement is permitted without prior written permission from" Corfu. *See* Corfu's Reply [Dkt. # 143], Ex. B (Corfu-Brickwood Subcontract). Accordingly, Mr. Kalos and Brickwood were explicitly prohibited from further contracting out Brickwood's responsibilities under its subcontract with Corfu without first obtaining Corfu's written permission. Even if Corfu granted Mr. Kalos some responsibilities as an agent in its dealings with WMATA, that explicitly did not include the authority to subcontract out Brickwood's work, much less to do so in Corfu's name. *See* RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (explaining that "only interactions that are within the scope of an agency relationship affect the principal's legal position").

There is no contradiction on this record to Mr. Kollas's assertion that he neither provided prior written permission nor otherwise consented to the A-J Marine subcontract, or that he was even aware of the A-J Marine subcontract purportedly signed on Corfu's behalf. *See id.*, Ex. A (Christos Kollas Aff.) ¶ 5. A-J Marine cites to nothing in the record to suggest that Corfu at any point modified or supplemented its initial and specific manifestation that Mr. Kalos was not to subcontract Brickwood work on the WMATA project. *See* RESTATEMENT (THIRD) OF AGENCY § 2.01 cmt. c ("[T]he principal's initial manifestation to the agent may often be modified or supplemented by subsequent manifestations from the principal and by other developments that the agent should reasonably consider in determining what the principal wishes to be done."). The Court sees no reason to change its conclusion that Mr. Kalos did not have actual authority to subcontract Brickwood work in Corfu's name.

### B.    Did Mr. Kalos Have Apparent Authority to Contract As Corfu?

Apparent authority is "created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." RESTATEMENT (THIRD) OF AGENCY: CREATION OF APPARENT AUTHORITY § 3.03; *see also id*. cmt. b (noting that "an agent's apparent authority originates with expressive conduct by the principal toward a third party through which the principal manifests assent to action by the agent with legal consequences for the principal"). "Apparent authority is present only when a third party's belief is traceable to manifestations of the principal." *Id*. § 3.03 cmt. b. "Thus, unlike actual authority, apparent authority does not depend upon any manifestation from the principal to her agent, but rather from the principal to the third party." *Makins*, 861 A.2d at 593; *see also Evans*, 742 F. Supp. at 33 ("In other words, as actual authority centers on the manifestations of the principal *to the agent*, apparent authority focuses on the manifestations of the principal *to the third party*.").

One way for apparent authority to be created is "when a principal places an agent 'in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold.   This falls short of an overt, affirmative representation by a principal.'" *Makins*, 861 A.2d at 593–94 (quoting *Feltman v. Sarbov*, 366 A.2d 137, 139 (D.C. 1976)). "The third party's perception may be based upon written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on [his] behalf by the person purporting to act for [him]." *Green Leaves Rest., Inc. v. 617 H St. Assocs.*, 974 A.2d 222, 230 (D.C. 2009) (quoting *Makins*, 861 A.2d at 594). "Whether an agent has apparent authority is a question of fact which must

-12-

be proved by the party asserting it." *St. James Mut. Homes v. Andrade*, 951 A.2d 766, 772 n.10 (D.C. 2008).

In its 2009 Opinion, the Court concluded that A-J Marine had failed to demonstrate that Mr. Kalos had apparent authority to enter into the subcontract with A-J Marine on Corfu's behalf. The Court found that "the evidence A-J Marine marshaled in discovery shows that A-J Marine relied on nothing more than Mr. Kalos's own representations that he was acting on behalf of Corfu." *A-J Marine*, 660 F. Supp. 2d at 89. "Most injurious to A-J Marine's case is that Mr. Nicholas expressed his own doubts about Mr. Kalos's authority to contract for Corfu." *Id*. at 90. "[B]ecause Mr. Kalos's own representations were the sole basis for A-J Marine's belief that Mr. Kalos was an agent of Corfu, A-J Marine cannot trace its belief to any manifestation by Corfu." *Id.* at 91.

The issue at the time of the Court's Opinion in 2009, and now, is whether Corfu can be held liable to A-J Marine for a subcontract signed by Mr. Kalos that appeared to A-J Marine to be a contract with Corfu. Finding no evidence that Corfu gave any direct indication to A-J Marine that it had so authorized Mr. Kalos, the Court denied summary judgment and directed the parties to submit expert opinions on the reasonableness of A-J Marine's reliance on Mr. Kalos's position vis-a-vis Corfu and/or Mr. Kalos's own assertions of authority as a sufficient manifestation by Corfu of Mr. Kalos's authority to contract.[5] *See A-J Marine*, 660 F. Supp. 2d at 93. The Court also sought

---

[5]   "It is well established in the District of Columbia that '[a] plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.'" *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 627 F. Supp. 2d 1, 7 (D.D.C. 2009) (quoting *Dist. of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)). "The doctrine [of apparent authority] applies to any set of circumstances under which it is reasonable for a third party to believe that an agent has authority, so long as the belief is traceable to manifestations of the

expert opinion on whether "Corfu failed to use reasonable care to prevent the circumstances that caused A-J Marine to believe that Mr. Kalos was an agent of Corfu." *Id.* The parties appear to have obtained expert opinions but neither party rests its argument on its expert and only Corfu even bothers to attack the opinion rendered by the opponent.[6]

---

principal. A third party's reasonable understanding of the principal's conduct will reflect general business custom as well as usage that is particular to the principal's industry and prior dealings between the parties." RESTATEMENT (THIRD) OF AGENCY: APPARENT AUTHORITY § 2.03 cmt. c; *see also Sigal*, 586 A.2d at 1219 ("Critical to apparent authority, therefore, is the third-party's perception of the agent's authority. One important method of testing that perception is by reference to the customary practice of other agents in similar situations.") (internal citations omitted).

    [6] Corfu attaches the unsworn expert report of A-J Marine's expert, Robert Beers, and argues the report fails to address the custom and standard in the industry on the topics requested by the Court and that it lacks a foundation for the opinions expressed therein. *See* Corfu's Mem. in Support of Mot. for Summ. J. [Dkt. # 137] at 4. A-J Marine neither submits nor addresses the substance of its expert report (let alone possible expert testimony) despite the Court's explicit request that it obtain expert opinion in order to speak to the issues of apparent authority and estoppel. Instead, A-J Marine perfunctorily states that the question of reasonableness is inappropriate for summary judgment. First, the challenged, unsworn expert report of Mr. Beers, as distinguished from an expert's sworn testimonial opinion, constitutes inadmissible hearsay. *See, e.g., Holland v. Norton*, 70 F. Supp. 2d 666, 668 (E.D. La. 1999). Whereas the admissibility or weight due expert opinion is a different inquiry than whether the expert testimony is sufficient to withstand a motion for summary judgment, *Ambrosini v. Labarraque*, 966 F.2d 1464, 1470 (D.C. Cir. 1992), even were the Court to consider the report, the same conclusions would ensue.

    Even if sworn, the Beers report contains errors of fact and opinions of law which deprive its conclusions of much force or persuasion. In addressing actual authority, Mr. Beers fails to take into account the fact that the subcontract between Brickwood and Corfu expressly forbade Brickwood/Mr. Kalos from subcontracting its responsibilities without prior consent from Corfu – a consent which was not received. On the question of actual authority, the Court finds that Mr. Beers's opinion is entitled to little weight and does not affect its finding that Mr. Kalos lacked actual authority. *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) (noting that the strength of an expert's factual grounding go towards the weight of the opinion, not its admissibility); *Mendes-Silva v. United States*, 980 F.2d 1482, 1488 (D.C. Cir. 1993) (noting that an expert must set forth specific facts showing a genuine issue for trial in order to withstand a motion for summary judgment). Further, Mr. Beers errs as to the date the Corfu power of execution was submitted to WMATA (long after, not before, the subcontract was executed). He assumes that letters "signed" in Mr. Kollas's name in January-February 2007 were actually known to, and signed by, Mr. Kollas when that fact is much disputed. Mr. Beers assumes that general industry practice was followed

Instead, A-J Marine relies on *Livingston v. Fuhrman*, 37 A.2d 747 (Mun. Ct. App. D.C. 1944) and *Tel-Ads, Inc. v. Trans-Lux Playhouse, Inc.*, 232 F. Supp. 198 (D.D.C. 1964), to support its argument that Corfu placed Mr. Kalos in such a position that it was reasonable for A-J Marine to believe that Mr. Kalos had authority to contract in Corfu's name.   In *Livingston*, Ms. Fuhrman visited Mr. Livingston's jewelry store and was shown rings by Mr. Lassover.  Mr. Lassover later visited Ms. Fuhrman at her home and sold her a diamond ring.  *Livingston*, 37 A.2d at 747.  This scenario was repeated when Ms. Fuhrman wanted to purchase a watch; she visited Mr. Livington's store, was waited on by Mr. Lassover, and later purchased a watch from Mr. Lassover when he visited her home.  *Id*. at 747–48.  When the watch ceased working within six months, Ms. Fuhrman sued Mr. Livingston.  He defended on the basis that Mr. Lassover was an independent jeweler who purchased items at wholesale from Mr. Livingston and sold them at retail to his own customers.  Admittedly, Mr. Livingston permitted Mr. Lassover to use his store to show jewelry, give out the store telephone number to receive customer calls, and take messages for Mr. Livingston in his absence.  *See id*. at 748.

Agreeing with the trial court, the D.C. Municipal Court of Appeals (predecessor to the District of Columbia Court of Appeals) stated, "When [Ms. Fuhrman] went to [Mr. Livingston's]

---

between the "general contractor" (Corfu) and "subcontractor" (A-J Marine) without accounting for Brickwood in between them.  Lastly, Mr. Beers fails to address the question of estoppel – whether, assuming Mr. Kalos lacked authority to execute the subcontract, Corfu should nonetheless be barred from denying its liability thereunder because it unreasonably failed to prevent the circumstances leading to A-J Marine's reasonable belief in Mr. Kalos's authority to contract.  Instead Mr. Beers opines that Mr. Kollas acted reasonably by designating Mr. Kalos to act as Corfu's agent in his absence through the power of execution, despite Corfu's argument that any agency held by Mr. Kalos expressly lacked the authority to enter into the subcontract in the first place.  While the Court does not speak to whether Mr. Beers's expert opinion would be admissible at trial, the Court finds that Mr. Beers's conclusions of law, as laid out in his expert report, are not only beyond his ken but unpersuasive.

retail jewelry store and was there shown jewelry by a salesman, she could reasonably assume that

the salesman was the agent of the store and not acting as an independent jeweler; and [Mr.

Livingston] was bound to anticipate that the situation permitted by him might reasonably lead to

such a conclusion." *Id*. at 748.   The Municipal Court of Appeals therefore agreed that Mr.

Livingston had clothed Mr. Lassover with apparent authority. *Id*.

A-J Marine also cites *Tel-Ads*.   The latter case involved an agreement between the

district manager of six movie theaters and a vendor of coupons for discount movie tickets.   Higher

management refused to recognize the coupons and insisted that the district manager had no authority

to enter into binding contracts for the theater.   The coupon vendor sued, arguing that it had relied on

the apparent authority of the district manager since there was no one superior to him in the

Washington-Baltimore area. *See Tel-Ads*, 232 F. Supp. at 199–200.   This court agreed, finding that

"it is abundantly clear to the Court that [district manager] Rosenfeld ha[d] apparent authority to enter

the agreement on behalf of defendants." *Id*. at 201.   The court noted:

> A principal is charged with knowledge of his agent's conduct, not
> only by what he knows, but also by what he would have ascertained
> if he had used ordinary care in looking after the conditions of the
> business affairs in which the agent was engaged.   [*Crane v. Postal
> Tel. Cable Co.*, 48 App. D.C. 54, 61-65 (1918)].   "One may be bound
> by the misrepresentation of his agent, if it is made in the exercise of
> his apparent authority, and relates to the matter intrusted to his
> management or control, and the party dealt with has no knowledge of
> the misrepresentation." *Crook v. International Trust Co.*, 32 App.
> D.C. 490, 507 (1909).

> It is clear to this Court that defendants' act of holding Rosenfeld out
> to the public as its district manager was sufficient to charge
> defendants with the agreement which Rosenfeld entered.   Defendants
> failed to exercise ordinary care in setting forth to Rosenfeld himself
> any limitations upon his authority, and therefore defendants created
> the very aura of authority on which both Rosenfeld and plaintiff

reasonably relied.

*Id*. at 201–02.  Neither *Livingston* nor *Tel-Ads* helps A-J Marine.  First, *Livingston* has little applicability; that it might be reasonable for a customer – a layperson – walking into a store to assume the person attending her is an agent of the store does not support A-J Marine in a scenario involving the construction industry and the more sophisticated activity of who may contractually bind a company – the very reason the Court requested expert discovery on this topic.  More importantly, unlike the defendants in both cases cited by A-J Marine, Corfu was completely clear in its subcontract with Mr. Kalos that he had no authority to subcontract without its prior authorization and A-J Marine itself recognized that there was a serious question of Mr. Kalos's authority.

Whether Corfu placed Mr. Kalos in a position which could have caused some other third party reasonably to believe that he had authority to subcontract Brickwood work remains unclear on this record.  What is at issue is whether *what was known to A-J Marine when it signed the subcontract* was sufficient for it reasonably to believe that Mr. Kalos had such authority.  This is a question of fact, the burden of proof of which rests squarely on A-J Marine.  *See Makins*, 861 A.2d at 594 ("Whether an agent had apparent authority is a question of fact and the party asserting the existence of apparent authority must prove it.").  The Court could conclude that A-J Marine fails to carry this burden despite several rounds of briefing and a request by the Court for expert opinion on this question.  *See Capitol Sprinkler Inspection, Inc. v. Guest Servs.*, 630 F.3d 217, 225 (D.C. Cir. 2011) (noting that when expert testimony is required on a particular mater, a court may properly grant summary judgment when the party fails to provide such testimony).

The record shows that James Nicholas of A-J Marine repeatedly demanded proof of

Mr. Kalos's authority, indicating his skepticism.  *See, e.g.*, Corfu Mem. in Support of Mot. for

Summ. J. [Dkt. # 137], Ex. M (Nov. 3, 2006 letter from Mr. Nicholas to Mr. Kalos) (requesting

allegedly past-due paperwork, including a "[n]otarized statement from Corfu Contractors, Inc. stating

your authority to execute contractual agreements on their behalf"); *id.*, Ex. N (Nov. 15, 2006 letter

from Mr. Nicholas to Mr. Kalos) ("You stated to me that you were not the owner of Corfu

Contractors, Inc. and promised me a statement of authority/affidavit (notarized) of your authority to

execute contractual agreements on behalf of Corfu Contractors, Inc.  You have neglected to provide

proof of this after repeated requests which without the contractual agreement is considered to be [at]

least misrepresented.  You said you were a man of your word so please provide this ASAP.  (By

11/16/06)").[7]  The requested proof of Mr. Kalos's authority was never received, although A-J Marine

had already signed the subcontract, despite its doubts, on October 24, 2006.  While the record is

inconclusive as to when Mr. Nicholas first doubted Mr. Kalos's authority, Mr. Nicholas's

contemporaneous uncertainty belies A-J Marine's current assertions of reasonable reliance.

A third party which was, or should have been, on notice that a purported agent did

not have authority to enter into an agreement cannot invoke the agent's apparent authority as a

mechanism to nonetheless bind the principal.  *See Ins. Mgmt., Inc. v. Eno & Howard Plumbing*

---

[7]  Mr. Nicholas swore by affidavit that he believed that he was contracting directly with Corfu, that he was never made aware of the existence of Brickwood, and that he only learned of Brickwood's existence during this litigation.  *See* [Dkt. # 80], Ex. A (James D. Nicholas Aff.) ¶ 4. "There was never a discussion on the part of any person with me of a subcontract between A-J Marine, Inc. and Brickwood Contractors, Inc. for purposes of the performance of the scour countermeasure project, or for any other purpose."  *Id.*  The point is not the existence of Brickwood but the existence of authority for Mr. Kalos to bind Corfu.  On this latter point, Mr. Nicholas himself was clearly unsure.  He cannot now ignore the record of his demands for proof of agency and assert that Corfu placed Mr. Kalos in a position upon which Mr. Nicholas reasonably relied as a manifestation of authority.

*Corp.*, 348 A.2d 310, 312 (D.C. 1975); *Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 67–68 (D.D.C. 2002) (underscoring that third party failed to take affirmative steps to determine the extent of the agent's authority despite reason to doubt the agent's purported authority). In other words, the third party must actually (and reasonably) believe the agent is authorized "when the principal places the agent in such a position as to mislead third persons into believing that the agent is clothed with the authority which in fact he does not posses." *Makins*, 861 A.2d at 594; *see also Williams v. Washington Metro. Area Transit Auth.*, 721 F.2d 1412, 1417 n.7 (D.C. Cir. 1983); RESTATEMENT (THIRD) OF AGENCY: CREATION OF APPARENT AUTHORITY § 3.03 (noting apparent agency exists when "a third party *reasonably* believes the actor to be authorized and the belief is traceable to the" principal's manifestation) (emphasis added). Thus, where reason to question exists, the third party cannot continue reasonably to retain the perception that the agent has the authority to conduct the transaction without further inquiry. *See, e.g., Ins. Mgmt.*, 348 A.2d at 312–13; *Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi,* 15 F. Supp. 2d 1, 8–9 (D.D.C. 1997) (noting that despite some notice of the agent's lack of authority, the third party's due diligence "more than adequately discharged any duty they might have to ascertain independently" the agent's authority to bind the principal).

A-J Marine does not directly respond to Corfu's repeated argument that Mr. Nicholas's own doubts about Mr. Kalos's authority to subcontract for Corfu demonstrates that such beliefs were unreasonable.[8] In evaluating whether a third party's belief of an actor's apparent agency

---

[8] Under Local Civil Rule 7(b), the Court could find that A-J Marine has conceded the argument to Corfu. *See Hopkins v. Women's Div.*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd* 98 Fed. Appx. 8 (D.C. Cir. 2004).

was reasonable, "consideration should be given, *inter alia*, to the actual authority of the agent, the usual or normal conduct of the agent in the performance of his or her duties, previous dealings between the agent and the party asserting apparent authority, any declarations or representations allegedly made by the agent, and lastly, the customary practice of other agents similarly situated." *Makins*, 861 A.2d at 594 (quoting *Mgmt. P'ship, Inc. v. Crumlin*, 423 A.2d 939, 941 (D.C. 1980)). The record reflects that Mr. Kalos lacked actual authority to enter into the subcontract on Corfu's behalf and it is unclear whether Kalos/Corfu and A-J Marine had had prior dealings. A-J Marine does not cite to contemporaneous representations allegedly made by Mr. Kalos as to his own authority to enter into the contract, although Mr. Kalos did sign the subcontract with A-J Marine; but Mr. Nicholas's November 12, 2006 letter to Mr. Kalos demonstrates that Mr. Kalos had explained at some point that he was not the owner of Corfu. Neither Corfu nor A-J Marine has presented its expert report on practices in the industry.

Further, since A-J Marine argues from the basis of information learned in discovery and *not* what it knew as of October 24, 2006, when A-J Marine and Mr. Kalos signed the subcontract,[9] it would appear that A-J Marine fails to meet or overcome Corfu's argument. A-J Marine ignores in briefing the maxim that for apparent authority to exist, the third party's beliefs must be reasonable. Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of

---

[9] A-J Marine almost entirely cites to evidence signed or procured by A-J Marine after it entered into the subcontract with Mr. Kalos as evidence of its reasonable belief that Mr. Kalos had authority to execute the subcontract. One exception is a fax dated September 27, 2006, on Corfu letterhead from "Lee" (presumably Vernon Lee Kalos) to Jim Nicholas which included a segment of Corfu's WMATA contract. *See* [Dkt. # 99], Ex. R1 (Sept. 27, 2006 Fax to Jim Nicholas). This lonely fax on Corfu letterhead from Mrs. Kalos does not provide sufficient evidence of Mr. Kalos's apparent authority.

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Strict legal analysis is contrary to A-J Marine's position on apparent authority, but given the parties' apparent inability to fully address and clarify the record on this point, the Court avoids resolving this question on summary judgment as unnecessary to its disposition of the case.

### C.    Is Corfu Estopped From Denying the Contract or Did It Ratify the Subcontract?

The legal principles of estoppel and ratification relate to different but closely-related questions that, on these facts, depend on the actions and inactions, knowledge or ignorance, and presence or absence of Christos Kollas, president of Corfu. A-J Marine advances both arguments in support of its contention that Corfu owes it money. However, neither question can be answered on this record.

Estoppel may bar a principal from denying the authority of an agent when the principal is responsible for a third party's belief in the agent's authority, although the principal has made no manifestation in support. *See* RESTATEMENT (THIRD) OF AGENCY: ESTOPPEL TO DENY EXISTENCE OF AGENCY RELATIONSHIP § 2.05. "Most often the person estopped will be responsible for the third party's erroneous belief as a consequence of a failure to use reasonable care, either to prevent circumstances that foreseeably led to the belief, or to correct the belief once on notice of it." *Id.* cmt. c. Thus, estoppel allows for a more attenuated connection between a principal's actions or inactions and a third party's perception of the actor's agency. However, as with apparent authority, if "the third party is unreasonable in believing that an agency relationship exists and that the actor has authority, the third party should not recover." *See id.* § 2.05 cmt. d.

There is no way on this record to determine when Mr. Kollas was in the United States, instead of Greece, during the fall of 2006 or what role or knowledge he had or reasonably should have had of Mr. Kalos's dealings with A-J Marine.  Depending on such facts and credibility determinations, Mr. Kollas could be found entirely uninvolved or to have had sufficient knowledge or obligation to oversee Mr. Kalos as a Corfu agent to be estopped from denying Mr. Kalos's role as agent in subcontracting with A-J Marine.

A-J Marine finally contends that even if Mr. Kalos lacked authority to contract on Corfu's behalf, Corfu later ratified the subcontract.  "Although an agent may not be authorized to do a certain act, if the principal, with knowledge of the act, acquiesces in it, by allowing the agent to do similar acts, or by retaining the benefits of the act when it was done in service to him, then the past unauthorized act is ratified."  *Lewis*, 463 A.2d at 671–72.  "The principal may ratify the act expressly or impliedly, by conduct inconsistent with any other hypothesis."  *Id*. at 672; *see also Columbia Hosp.*, 15 F. Supp. 2d at 9 ("To be sure, for a court to conclude that a corporate entity ratified an unauthorized act, the intent must be clearly established and will not be inferred from doubtful or equivocal acts or language.") (internal quotation marks omitted).  The D.C. Circuit acknowledged that the D.C. Court of Appeals in *Lewis* "articulated an even more exacting standard for finding ratification," such that where facts "do not compel the conclusion" of ratification and/or "are susceptible of other interpretations" a court should avoid finding ratification.  *See Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 465 (D.C. Cir. 1989).

The parties argue over whether some of the correspondence concerning the subcontract sent by "Corfu" to A-J Marine in early 2007 and mid-summer 2007 was signed by Mr. Kollas himself or someone else, presumably Mr. or Mrs. Kalos.  Mr. Kollas contests what appears

-22-

to be his signature.  Further, in its opening brief, A-J Marine seemed to accept that Mr. Kollas was in Greece and not personally involved from Christmas 2006 to March 2007.  *See* Pl.'s Opp'n at 9 ("One of the reasons that Mr. Kollas played no role in the project was that he was physically absent for much of the time.  He annually travels to Greece for a couple of months starting in December and a couple of months in the summer.  As to the winter of 2006-2007, he testified that he departed before Christmas and 'I think I came back in March.'") (citations omitted)).  In its supplemental opposition to Corfu's motion, however, A-J Marine points to Mr. Kollas's passport and contests the timing of his absences in early December 2006, the early months of 2007, and the July-September time period of that year.  *See* Pl.'s Supplemental Opp'n [Dkt. # 144] at 1–3.

Complicating matters, Corfu's initial Answer to the A-J Marine Complaint admitted the execution of the subcontract and advanced counter-claims against A-J Marine based on its legitimacy.  Mr. Kollas later disavowed this pleading as drafted by Corfu's attorney in error and without his input because Mr. Kollas was in Greece.[10]  His disavowal means the first Corfu Answer no longer has the effect of a judicial admission, *Nat'l Steel & Shipbuilding Co. v. Am. Home Assur. Co.*, Civ No. 09-279, 2010 U.S. Dist. LEXIS 73280, *6–7 (S.D. Cal. July 21, 2010), but as Corfu concedes, "the effect of the original pleading in such circumstances is only but a piece of competent evidence of the fact stated."  Corfu's Reply at 2; *see also Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir. 1929); *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995).  If a party makes an admission that it later withdraws in a subsequent pleading and thereafter contests, both pieces of evidence may be submitted to the factfinder who is free to choose the more credible between them.  *See Kunglig*, 32 F.2d at 198.  Clearly, the fact that the early

---

[10]  Apparently, the Corfu attorney got all of his information from Mrs. Kalos.

Answer is no longer binding as a judicial admission does not transform the later disavowal into an uncontested fact.  Corfu has advanced two conflicting facts and a factfinder must sort them out.

As viewed by a fact-finder making credibility determinations, these event(s) may be sufficient to find that Mr. Kollas ratified the A-J Marine subcontract executed by Mr. Kalos.  While Corfu argues that Mr. Kollas "has neither allowed [Mr.] Kalos to continue to contract on his behalf, nor reaped any benefits from [Mr.] Kalos' actions," Corfu Reply at 7, the first of these fact statements may not be credited by a fact-finder, depending on testimony and documentation of Mr. Kollas's whereabouts and his involvement at critical times in 2006 and 2007.

Despite herculean efforts, the parties are unable to present sufficient uncontested material facts for the applicability of ratification to be resolved on the papers.  Summary judgment on this point must be denied to all parties.

### D.      Did A-J Marine Breach the Subcontract?

The parties argue vociferously over whether A-J Marine breached the subcontract by failing to provide required Virginia workers' compensation insurance, thereby giving Kalos/Corfu justification to terminate the subcontract.  A-J Marine explains:

> A-J Marine submitted its Certificate of Insurance on October 27, 2006.  It showed that A-J Marine carried Commercial General Liability insurance, automobile liability insurance, workers' compensation insurance, and two floaters, or riders, referring to equipment.  If Corfu was not satisfied with this insurance, then, as the Subcontract provided, Corfu should have paid for additional insurance.  Corfu did not do so.

Pl.'s Opp'n at 28–29 (internal citation omitted).  To the contrary, the language of the subcontract and addendum, the rules of contract interpretation, and common sense are against A-J Marine's position.

According to the terms of the subcontract, signed on October 24, 2006, "[t]he

Subcontractor agrees *to obtain and pay for* the following insurance coverages: Workmen's Compensation, Public Liability, Property Damage, and *any other insurance coverage which may be necessary as required by the Owner, Contractor, or State Law*, Per Contract Specifications and County Requirements." *See* [Dkt # 81], Ex. A (A-J Marine Subcontract) at 1 (emphasis added).  In an addendum, initialed by Mr. Kalos and Mr. Nicholas on the same date, the parties agreed that "[a]ny additional insurance requirements above what is in place will be *passed thru* to the general contractor." *Id.* at 4 (emphasis added).

Corfu's insurance agent insisted that A-J Marine had to have Virginia workers' compensation insurance in order to work on the project because A-J Marine's employees would start work at Columbia Island Marina and Gravelly Point National Park, on the west side of the Potomac River.  *See* Kalos Reply [Dkt. # 146], Ex. 1 (Veron Lee Kalos Aff.) ¶ 8 (citations omitted).  It appears that A-J Marine's insurance agent informed Mrs. Kalos that "A-J Marine did not have insurance to cover worker's [sic] performing work outside the State of Maryland." *Id.* ¶ 10.  In partial response, A-J Marine notes that the jurisdiction of the District of Columbia extends to the high-water mark of the Potomac River on the Virginia side, that all the work would therefore be performed in D.C., and that Virginia workers' compensation insurance was unnecessary.  *See* Pl.'s Opp'n at 30.  More pointedly, A-J Marine also insists that the addendum required Kalos/Corfu, not A-J Marine, to pay up front for any such insurance.  *See id.* at 29–30.

Whether Virginia workers' compensation insurance was required is not germane to the lawsuit.  When informed it needed additional insurance, A-J Marine obtained a quote for such insurance and forwarded that quote to Kalos/Corfu for payment.  Kalos/Corfu refused to pay for the additional insurance and refused to recognize that A-J Marine had mobilized its workforce or to

permit it to begin work.  Frustrated in its efforts to perform and facing winter weather, A-J Marine pulled its workers and equipment.  Kalos/Corfu then terminated the subcontract claiming breach by A-J Marine because it failed to obtain Virginia insurance.  A-J Marine claimed breach by Kalos/Corfu because it refused to pay for the insurance and then barred A-J Marine from performance.

A-J Marine protected itself in the subcontract by obtaining agreement from Mr. Kalos that if Kalos/Corfu wanted more insurance than "what is in place," such a requirement would be "passed through" to the general contractor.  *See* [Dkt # 81], Ex. A (A-J Marine Subcontract) at 4. The question for interpretation is whether "passed thru" meant "paid in advance" or "added to the contract as a cost."  The parties disagree.  A-J Marine argues that "passed thru" meant that if Kalos/Corfu wanted additional insurance, it would pay to obtain it.  A fax from Mrs. Kalos to Ohio Casualty arguably supports A-J Marine's position because she indicated that Kalos/Corfu "did agree to pay, if any additional insurance was required, and this would be passed on to the Owner."  [Dkt. # 80], Ex. K (Feb. 6, 2007 Corfu fax to Ohio Casualty Group).  What this boils down to is that both parties agree that A-J Marine would not ultimately bear the cost of additional insurance but disagree when payment or reimbursement was to occur, that is, whether A-J Marine was responsible for paying for the additional insurance in the first instance and then adding the whole charge to its bill to Kalos/Corfu for later reimbursement or whether A-J Marine was only responsible for getting a bid for the insurance and Kalos/Corfu was required to pay for it immediately before work began.

At best, the addendum is ambiguous on the question of timing; more specifically, the

provision that contains the "pass thru" language is silent on the point.[11]   "Under general contract law, the plain and unambiguous meaning of an instrument is controlling, and the Court determines the intention of the parties from the language used by the parties to express their agreement." *Washington Metro. Area Transit Auth. v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C. Cir. 1980) (internal citation omitted).   "In performing this task, the Court should construe the contract as a whole so as to give meaning to all of the express terms."   *Id.*   These principles of contract interpretation guide the interpretation here; the subcontract and the addendum must be read as a whole so as to give meaning to all terms.

The subcontract clearly required A-J Marine "to obtain and pay for" workmen's compensation, other listed insurance, and "any other insurance coverage which may be necessary as required by the" contractor.   *See* [Dkt # 81], Ex. A (A-J Marine Subcontract) at 1.   This provision clearly intended that a subcontractor would pay for additional insurance, as needed, as part of its overhead and without additional charges to the project.   The addendum provided that any additional insurance beyond that already carried by A-J Marine – or "already in place" – would be "passed thru" to the general contractor, Kalos/Corfu.   Neither party disputes that this meant that the full cost of such additional insurance could be "passed thru."   As a result, A-J Marine and Mr. Kalos agreed that any additional insurance would not be an overhead expense for A-J Marine, as is normal for workers' compensation insurance, but would be an additional charge on the subcontract for A-J

---

[11] Ohio Casualty suggests that, at worst, the ambiguity and the parties' conflicting arguments could indicate that there was no meeting of the minds and no contract formation.   Without a contract on which to sue, A-J Marine would be left with a potential right to see damages under a theory of quantum meruit.   However, none of the parties disputes the *fact* of the subcontract even as they dispute its interpretation and which entity is liable, if any, to A-J Marine.   Their positions are no different than many parties to a contract dispute, arguing for an interpretation that advances their respective positions.

Marine's work.  The addendum did not specify any modification to the language of the subcontract and did not specify the timing of payment from the general contractor.

Reading the subcontract and the addendum *seriatim* gives force to the subcontract's requirement that a subcontractor "obtain and pay for" additional insurance and the addendum's allowance that the cost of additional insurance would then be "passed thru" to the general contractor. Taking all provisions into account, the meaning of the parties' agreement was that A-J Marine was required to obtain and pay for Virginia workers' compensation insurance, even if disputed, and thereafter "pass thru" its entire cost to the general contractor as a charge on the project.  In addition, it appears the "pass thru" language was introduced into the parties' agreement by A-J Marine itself, *see* Kalos Reply, Ex. 1 (Veron Lee Kalos Aff.) ¶ 5, which would indicate that A-J Marine must bear the brunt of any ambiguity as drafter of the addendum.  *See Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 328 (D.C. 2001).

Common sense supports this interpretation as well.  State law requires workers' compensation insurance to be in place before any workers begin to work, *see, e.g.,* VA. CODE ANN. §§ 65.2-100 *et seq*., and A-J Marine, as employer, was in a better position than Kalos/Corfu to add such coverage quickly.  Delaying the start of A-J Marine's performance while Kalos/Corfu paid for the insurance, thereby postponing a job on which there were tight schedules, seems an unlikely intention of the contracting parties.  Read together, the subcontract and addendum required A-J Marine to obtain and pay for any additional insurance as needed and allowed A-J Marine to add the whole cost of such insurance to its charges on the project.  Since A-J Marine did not pay for Virginia workers' compensation insurance, as required by Kalos/Corfu, it breached the parties' agreement.

E.    Are There Outstanding Claims Against Peter Kalos?

Mr. Kalos also moves to dismiss, or for summary judgment, on the Third Party Complaint filed by Corfu in this action.   He essentially argues that Corfu should have sued Brickwood Contractors, not Mr. Kalos personally.   *See generally* Kalos Mot. for Summ. J. [Dkt. # 139].   Corfu opposes the motion and asserts:

> In its Third Party Complaint against Peter Kalos, Corfu simply alleges that Peter Kalos, in his individual capacity, improperly signed the Subcontract Agreement with A-J Marine and thereby caused A-J Marine to sue Corfu instead of the proper party, Brickwood Contractors, Inc.   Corfu simply claims that, to the extent that Kalos's actions with A-J Marine are binding on Corfu, Kalos' [sic] is personally liable to Corfu because of his fraudulent misrepresentation of authority.

*See* Corfu Opp'n to Kalos Mot. for Summ. J. [Dkt. # 140] at 3.   Corfu also seeks "the costs and fees incurred by Corfu in this proceeding."   *Id.* at 4.

The Court has found that Mr. Kalos lacked actual authority to execute the subcontract and that the question of apparent authority is better left unresolved.   These conclusions are based on the absence of Corfu representations to Mr. Kalos that he could so subcontract (actual authority); and a failure of the parties to clarify whether A-J Marine's belief that Corfu had conferred authority on Mr. Kalos to enter into the subcontract was reasonable given the facts it then knew and contemporaneous doubts expressed by Mr. Nicholas.   Further undetermined is: 1) whether Mr. Kollas was in this country and/or knew enough or so positioned Mr. Kalos that Corfu should be estopped from denying liability for the subcontract; or 2) whether Mr. Kollas was in this country and/or knew or took part in the correspondence on the subcontract or early litigation so that he ratified the subcontract or has admitted Corfu's liability.

-29-

None of these remaining questions depends on Mr. Kalos but revolves entirely around Mr. Kollas and his actions/inactions, presence/absence, knowledge/ignorance. In addition, as the Court has found that Corfu is not liable to A-J Marine for breach of the subcontract, indemnification is not at issue. Nor does the Court find any basis on this record to order Mr. Kalos to compensate Corfu for its costs and fees in this litigation. The Court will dismiss the Third Party Complaint against Mr. Kalos.

### F.  Is Ohio Casualty Liable to A-J Marine for Contract Damages?

Ohio Casualty provided the performance and payment bonds to Corfu for the project. While Ohio Casualty joins Corfu's motion for summary judgment on all grounds discussed above, Ohio Casualty also argues it is entitled to summary judgment in its own right. Ohio Casualty contends that the vast majority of A-J Marine's claimed damages are in the form of alleged lost profits deriving from the breach of contract claim and not from actual costs incurred by A-J Marine in providing labor and materials to the bonded project. Accordingly, Ohio Casualty argues these damages fall beyond the scope of costs recoverable under the payment bond issued by Ohio Casualty.

The payment bond contained a penal sum limit of 40% of the prime contract price, or a maximum liability of $644,800. The payment bond provided that Ohio Casualty's obligations under the payment bond became null and void "if the Principal shall promptly make payment to all claimants as hereinafter defined supplying labor and material in the prosecution of the work provided for in said contract, and any and all duly authorized modifications of said contract that may hereafter be made." *See* Ohio Casualty's Mem. in Support of Mot. for Summ. J. [Dkt. # 138] ("Ohio Casualty's Mem."), Ex. 1 (Payment & Performance Bonds ("Bond")) at 3. In other words, the payment bond was in place to assure payment to subcontractors who performed work on the

subcontract if Corfu failed to pay.  The payment bond defined a claimant as:

> [O]ne having a direct contract with the Principal or with a
> subcontractor of the Principal for labor, material, or both, used or
> reasonably required for use in the performance of the contract, labor
> and material being construed to include that part of water, gas, power,
> light, heat, oil, gasoline, telephone service, or rental of equipment
> directly applicable to the CONTRACT.

*Id.*  Ohio Casualty is sued by A-J Marine for its full contract losses.  Ohio Casualty states, without

contradiction, that A-J Marine did not remove any sediment around the bridge piers at the project

as required by the subcontract; that A-J Marine did not place any stone around the bridge piers as

required by the subcontract; that the only labor performed by A-J Marine involved mobilization and

initial preparation to begin to work on the subcontract and demobilization after the dispute about

insurance coverage arose; and that A-J Marine moved its equipment off the project site on December

15, 2006.  Ohio Casualty's Mem. at 8.  Finally, pursuant to the subcontract, A-J Marine agreed to

be compensated in the amount of $5,000 for mobilization costs and $5,000 for demobilization costs.

Ohio Casualty argues that its liability runs only to subcontractors for "labor, material,

or both, used or reasonably required for use in the performance" of the project.  As a result, it

contends its maximum liability to A-J Marine can be only $10,000, the subcontract cost provided

for mobilization and demobilization.  *See* [Dkt. # 81], Ex. A (A-J Marine Subcontract) at 5.  In

contrast, A-J Marine insists that the payment bond allows it to receive all "sums as may be justly [be]

due," *see* Bond at 3, and that these sums include lost revenue, lost profits, and idle equipment

charges.  It argues that Kalos/Corfu improperly terminated the subcontract and that it is entitled to

full contractual damages of $624,158 from the payment bond.

A-J Marine misconstrues the language and purpose of the payment bond and the

surety's obligations, which "must be measured by the conditions stated in the bond." *Goldberg,*

*Marchesano, Kohlman, Inc. v. Old Republic Sur. Co.*, 727 A.2d 858, 860-61 (D.C. 1999) (quoting

*Bevard v. New Amsterdam Cas. Co.*, 132 A.2d 157, 159 (D.C. 1957)).   Moreover, when ambiguity

in terms arises, the "rule that the obligation is to be construed against the surety and in favor of the

beneficiaries of the bond is one of construction only.   In the absence of ambiguity it should not be

invoked to circumvent the plain language of the contracting parties." *Id*. at 861 n.1 (quoting *U.S.*

*Plywood Corp. v. Cont'l Cas. Co.*, 157 A.2d 286, 288 (D.C. 1960)).   Here, the terms of the bond are

not ambiguous.   The payment bond contained no express or implied promise to pay breach-of-

contract damages.   Its obligations are more limited to the kinds of damages that would apply in a suit

under *quantum meruit*:   the "labor and material in the prosecution of the work provided for" in the

prime contract, *see* Bond at 3.   But, except for its mobilization and demobilization costs[12] which

clearly arose under the subcontract, A-J Marine seeks no compensation for labor, materials or

equipment actually supplied to the project; it wants lost revenue and profits from the subcontract for

---

[12] Ohio Casualty notes that A-J Marine may have performed some "initial preparation work." *See* Ohio Casualty Mem. at 8; *id*. at 5 ("A-J Marine did mobilize its crew and equipment on approximately October 24, 2006 but never performed any dredging or stone placement. . . . The facts are undisputed that A-J Marine performed almost no physical work on the Project."); *but see id*. at 10 ("As the undisputed facts demonstrate, at most, A-J Marine mobilized and demobilized from the Project; it performed no substantive work.").  Capitalizing on these comments, A-J Marine attempts to argue that Ohio Casualty has conceded that it performed *some* work beyond mobilization and/or demobilization.   *See* A-J Marine's Supplemental Mem. in Response to Ohio Casualty's Mot. for Summ. J. [Dkt. # 148] at 1–2.  A-J Marine thereafter cites a letter as proof that some work did occur, however the letter was from Mr. Nicholas and only stated that A-J Marine had mobilized its equipment but were prevented from working by Corfu, which had failed to provide "material barges for the dredge material or rock to perform the work with."   *See* [Dkt. # 85], Ex. 1 (Jan. 29, 2007 Letter from Mr. Nicholas to Mr. Kollas) at 14.   Thus, beyond conclusory statements, A-J Marine has failed to specify any such work in its claim for damages and thereby forfeits it as to Ohio Casualty. *See* LCvR 7(b); *Greene*, 164 F.3d at 675.   Accordingly, the Court finds that the only work at question here is A-J Marine's mobilization and demobilization at the project.

work not done.  However, when the terms of a payment bond are "clear and unambiguous," the terms "must be applied as written."  *Dist. Contractors, Inc., v. N. Am. Specialty Ins. Co.*, 281 F. Supp. 2d 204, 207 (D.D.C. 2003).  Such is the case here.

The Court finds that Ohio Casualty would be liable to A-J Marine, if at all, in the amount of $10,000 for mobilization and demobilization.  Summary judgment will be entered for Ohio Casualty in full without an order for payment because the Court has found that A-J Marine breached the subcontract.[13]

## IV.  CONCLUSION

For the reasons stated above, Corfu's motion for summary judgment [Dkt. # 137] and Ohio Casualty's motion for summary judgment [Dkt. # 138] will be granted.  The Court will further dismiss the Third Party Complaint [Dkt. # 22] against Mr. Kalos.  Accordingly, Mr. Kalos's motion for summary judgment [Dkt. # 139] will be denied as moot.  A memorializing Order accompanies this Memorandum Opinion.

Date: September 13, 2011                          _____/s/_____
                                                 ROSEMARY M. COLLYER
                                                 United States District Judge

---

[13]  The Court addresses open issues to aid the parties in any further efforts at settlement.